**LANCO DAIRY FARMS COOPERATIVE,**
Plaintiff,

v.

**SECRETARY OF AGRICULTURE,**
Defendant.

**Civil No. JFM 07–2806.**

United States District Court,
D. Maryland.

Aug. 25, 2008.

Kenneth Sigman, Susan Claire Silber, Silber and Perlman PA, Takoma Park, MD, John Harald Vetne, John H. Vetne, Attorney at Law, Raymond, NH, for Plaintiff.

Larry D. Adams, Office of the United States Attorney, Baltimore, MD, for Defendant.

## MEMORANDUM

J. FREDERICK MOTZ, District Judge.

Plaintiff Lanco Dairy Farms Cooperative ("Lanco"), an association that represents dairy farmers, has brought this lawsuit against defendant, the Secretary of Agriculture ("the Secretary"). Lanco has asserted two claims. The first claim challenges the Secretary's administrative determination that Lanco is subject to certain shipping standards because Lanco is a "reporting unit" as that term is understood in 7 C.F.R. § 1001.13(b)(2). (Compl. ¶ 19.) The second claim is that the Secretary, in making the aforementioned administrative determination, violated 5 U.S.C. § 557(c) "by failing to show 'the ruling on each finding, conclusion, or exception presented.'" (*Id.* ¶ 20 (quoting 5 U.S.C. § 557(c)).) Both Lanco and the Secretary have moved for summary judgment. For the reasons briefly stated below, Lanco's motion will be denied, and the Secretary's motion will be granted.

## FACTS

Pursuant to the Agricultural Marketing Agreement Act ("AMAA"), 7 U.S.C. § 608 *et seq.*, the Secretary possesses the authority to regulate the milk market. The Secretary exercises this authority by issuing orders, having the effect of agency regulations, that are known as Milk Marketing Orders. 7 U.S.C. § 608c(1); *id.*

§ 608c(5)(M) (using the term "milk marketing order"). The Northeast Milk Marketing Order is at issue in this suit. (Compl. ¶ 7.) The Northeast Milk Marketing Order regulates milk production, price, and distribution in a particular geographic area. *See* 7 C.F.R. § 1001.2 (defining the Northeast milk marketing area, including all of Connecticut, Delaware, Massachusetts, New Hampshire, New Jersey, Rhode Island, Vermont, and the District of Columbia, and portions of Maryland, New York, Pennsylvania, and Virginia).

The particulars of milk regulation in the United States are not relevant to the discrete regulatory interpretation issue faced here, and I will not lay out the regulatory schema in great detail. However, the United States Court of Appeals for the District of Columbia Circuit has previously provided a brief outline of the framework of milk regulation:

> Since the mid–1930's, Congress has provided for the comprehensive regulation of the marketing of various agricultural commodities, including milk and milk products, in the metropolitan areas of this country.... Lest all producers seek to channel their milk into the most profitable fluid milk market, with the inevitable consequence of ruinous price competition and unstable farm incomes, Congress has authorized the Secretary to normalize the harsh consequences of milk cycles insofar as possible by apportioning the benefits and burdens of market variables.... The essence of the regulation is an effort to avoid the feverish competition by producers for the limited, but premium priced, fluid milk market by fixing a 'blended' or average minimum price payable to all producers irrespective of the use to which their particular milk is ultimately put.

*Blair v. Freeman,* 370 F.2d 229, 232–33 (D.C.Cir.1966) (footnotes and internal citations omitted).

For the purposes of this case, it is sufficient to know that producers of milk want to qualify for the " 'blended' or average minimum price," *id.* at 233, and that producers must meet whatever standards are set for them in the Milk Marketing Order in order to so qualify.

Under the relevant regulations, Lanco is a "handler." *See* 7 C.F.R. § 1000.9(c). More specifically, Lanco is a cooperative association that "markets milks for its producer members in the Northeast under the Northeast Milk Marketing Order by deliveries of its members' milk...." (Pl.'s Mem. in Supp. of Mot. for Summ. J. at 4–5.) In its role as marketer, Lanco is responsible for qualifying the milk of its members as milk eligible to receive the blended minimum price. (*See id.* at 5.) In July 2005, Lanco was informed that the milk it marketed would no longer qualify for the blended minimum price unless Lanco came into compliance with the standards of 7 C.F.R. § 1001.7(c). (Compl. ¶ 8.) According to the Secretary, Lanco was subject to those standards because Lanco is a "reporting unit" in 7 C.F.R. § 1001.13(b)(2). (*See id.* Ex. A, Decision of USDA Judicial Officer.)

Section 1001.13(b)(2) mandates that "each reporting unit" meet the "shipping standards specified ... [in] § 1001.7(c)...." Prior to July 2005, Lanco was not meeting those standards. (Compl. ¶ 9.) Beginning in July 2005, however, Lanco undertook the steps necessary to meet the standards and thus to continue to qualify its members' milk for the blended minimum price. (*Id.* ¶ 14.) The cost of coming into compliance with the standards was approximately $26,000 to $30,000 a month, monies that Lanco now seeks to

recover as damages in this action.[1] (*Id.* ¶ 13.)

 Lanco believes that the regulations do not require it to meet the standards of § 1001.7(c) because it is not a "reporting unit" as that term is understood in § 1001.13(b)(2). Lanco has exhausted the administrative remedies available to it through various petitions and administrative appeals. (*See generally id.* ¶¶ 14–18.) These appeals were unsuccessful, and Lanco thus filed this lawsuit seeking judicial review of the agency determination. (*Id.*) For the reasons discussed below, summary judgment will be granted in the Secretary's favor.

## ANALYSIS

For simplicity's sake, I reproduce the relevant part of the disputed regulation here:

Producer milk means the skim milk (or the skim equivalent of components of skim milk) and butterfat contained in milk of a producer that is:

... (b) Received by the operator of a pool plant or a handler described in § 1000.9(c) in excess of the quantity delivered to pool plants subject to the following conditions:

(1) The producers whose farms are outside of the states included in the marketing area and outside the states of Maine or West Virginia shall be *organized into state units and each such unit shall be reported separately*; and

(2) For pooling purposes, *each reporting unit* must satisfy the shipping standards specified for a sup-

ply plant pursuant to § 1001.7(c)
. . .

7 C.F.R. § 1001.13(b) (emphasis added).

The essential question in this case is whether the term "reporting unit" in subsection (b)(2) is exclusive or inclusive of § 1000.9(c) handlers like plaintiff. I am persuaded by defendant's position for two central reasons. First, I believe the regulation, as written, is ambiguous, and thus I will accord substantial deference to the Secretary's interpretation. Second, plaintiff's interpretation of the regulation may result in the enactment of an impermissible economic trade barrier that disfavors the production of milk products outside of the Northeast Milk Marketing Area. Below, I briefly examine these issues.

*Ambiguity and Resulting Deference*

Plaintiff argues that the phrase "each reporting unit" makes reference to the language of the preceding subsection, § 1001.13(b)(1). *See* 7 C.F.R. § 1001.13(b)(1) (". . . . organized into state units and *each such unit shall be reported separately* . . . .") (emphasis added). This argument is not without appeal. However, it does not necessarily follow that, as plaintiff asserts, plaintiff and other similar handlers are *excluded* from the ambit of § 1001.13(b)(2), and thus the shipping obligations of § 1001.7(c).

As plaintiff claims, subsection 1001.13(b)(1) makes clear that out-of-area producers are to be grouped together into state units and that such state units are reporting units. Subsection 1001.13(b)(2) makes clear that such out-of-area state reporting units are subject to the requirements of § 1001.7(c). However, it is entirely possible that the phrase "each reporting unit" was intended to subsume

---

1. Section 1001.7(c) requires certain percentages of the "total quantity of milk" shipped, depending on the month of the year, to be shipped to pool distributing plants rather than to any pool plant. *See* 7 C.F.R. § 1001.7(c).

both out-of-area state reporting units *and* in-area handlers like plaintiff. In this way, § 1001.13(b)(1) may operate to show that out-of-area state units *are also* reporting units, rather than to define the universe of reporting units as *exclusively* out-of-area state units. The regulation is thus ambiguous. And, just as a tie goes to the runner, so do ambiguities go in favor of the issuing agency. As the Supreme Court has stated in an analogous context:

> While it is possible that the [plaintiff's] parsing of these impenetrable regulations would be consistent with accepted canons of construction, it is axiomatic that the Secretary's interpretation need not be the best or most natural one by grammatical or other standards. Rather, the Secretary's view need be only reasonable to warrant deference.

*Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 702, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991).

 In according deference to the Secretary's interpretation of an ambiguous regulation here, I am also acutely aware that "[a] court's deference to administrative expertise rises to zenith in connection with the intricate complex of regulation of milk marketing. Any court is chary lest its disarrangement of such a regulatory equilibrium reflect lack of judicial comprehension more than lack of executive authority." *Blair*, 370 F.2d at 232.

*Impermissible Economic Trade Barriers*

The AMAA bars the Secretary of Agriculture from imposing economic trade barriers with respect to milk and milk products. The relevant statutory provision, 7 U.S.C. § 608c(5)(G), states:

No marketing agreement or order applicable to milk and its products in any marketing area shall prohibit or in any manner limit, in the case of the products of milk, the marketing in that area of any milk or product thereof produced in any production area in the United States.

This provision has been construed, logically enough, as a prohibition on the enactment of economic trader barriers among and between milk marketing areas. *See Lehigh Valley Co-op. Farmers, Inc. v. United States*, 370 U.S. 76, 97, 82 S.Ct. 1168, 8 L.Ed.2d 345 (1962) (finding that § 608c(5)(G) "was compendiously intended to prevent the Secretary from setting up, under the guise of price-fixing regulation, *any kind of economic trader barriers*, whether relating to milk or its products") (emphasis added); *see also Polar Ice Cream & Creamery Co. v. Andrews*, 375 U.S. 361, 379, 84 S.Ct. 378, 11 L.Ed.2d 389 (1964) (to the same effect); *Lewes Dairy, Inc. v. Freeman*, 401 F.2d 308, 315 (3d Cir.1968) (observing that § 608c(5)(G) "evolved out of the Congressional intent to restrain the Secretary from imposing regulations which would burden the free flow of milk and its products in commerce").

Plaintiff's interpretation of the regulation, explicitly placing additional burdens only onto the shoulders of out-of-area handlers, would appear to violate § 608c(5)(G).[2] By imposing additional shipping requirements—that, according to plaintiff's own complaint, impose additional costs—on out-of-area handlers, plaintiff's interpretation may result in an economic trade barrier that disfavors out-of-area milk products. Such inequitable treatment of out-of-area milk is precisely what

2. This possibility was first raised by the USDA Judicial Officer during the administrative proceedings. (*See* Compl. Ex. A, Decision of USDA Judicial Officer at 13–14 (noting that plaintiff's interpretation may give rise to an impermissible "economic trade barrier against milk that originates outside the Northeast marketing area").)

the AMAA seeks to prevent in § 608c(5)(G). *Cf. Sani–Dairy v. Espy*, 939 F.Supp. 410, 416 (W.D.Pa.1993) (striking down portion of milk marketing order because it constituted "an economic trade barrier making nonpool milk more expensive," and thus "impermissibly limiting the marketing of dairy products in the [marketing area] for the benefit of 'those doing business in [that area], at the expense of those outsiders seeking to enter the market,' in violation of 7 U.S.C. § 608c(5)(G)") (quoting *Lewes Dairy, Inc.*, 401 F.2d at 315) (internal citations omitted) (alterations added and in original).

For the reasons discussed *supra*, Lanco's motion for summary judgment will be denied, and the Secretary's motion for summary judgment will be granted.[3] A separate order effecting the rulings made in this Memorandum is being entered herewith.

### ORDER

For the reasons stated in the accompanying memorandum, it is, this 25th day of August, 2008

ORDERED

1. Plaintiff's motion for summary judgment is denied;

2. Defendant's motion for summary judgment is granted; and

3. Judgment will be entered for defendant, and the case closed.

---

**3.** Lanco's complaint makes a second claim— namely that the Secretary's administrative decision failed to "show 'the ruling on each finding, conclusion, or exception presented,'" in violation of 5 U.S.C. § 557(c). (Compl. ¶ 20 (quoting 5 U.S.C. § 557(c)).) Lanco appears to have abandoned this claim. (*See* Pl.'s Mem. in Supp. of Mot. for Summ. J. at 3–4 ("[N]o issue of evidentiary finding, administrative discretion, substantial record evidence, or statutory authority is raised in the questions presented by plaintiff.").) Even if not abandoned, I have reviewed the claim, and it is without merit. I dismiss it accordingly.